Joyce Ann **REYNOLDS**, Plaintiff,

v.

**GOLDEN CORRAL CORP.,**
**et al., Defendants.**

No. Civ.A. 97–W–1295–S.

United States District Court,
M.D. Alabama,
Southern Division.

March 11, 1999.

Jennifer Lynn Atwell, Dothan, AL, Matthew C. Lamere, Dothan, AL, for plaintiff.

William C. Carn, III, Dothan, AL, for defendants.

### MEMORANDUM OPINION AND ORDER

WALKER, United States Magistrate Judge.

Plaintiff Joyce Ann Reynolds commenced this action on August 27, 1997 against defendants Golden Corral Corporation, plaintiff's former employer, and Ricky Gibson, plaintiff's former supervisor. Plaintiff alleges that, while she was employed by Golden Corral, she was subjected to lewd sexual comments, sexual advances, and physical and verbal abuse by Gibson. The complaint sets out three counts pursuant to Title VII:(1) *quid pro quo* sexual harassment, (2) hostile environment sexual harassment, and (3) retaliation. Additionally, plaintiff brings three state law claims: (1) assault and battery, (2) invasion of privacy, and (3) intentional infliction of emotional harm. This action is presently before the court on the motion for summary judgment filed by defendants on January 15, 1999. Defendants contend that they are entitled to summary judgment on all of plaintiffs claims. Upon consideration of the motion, the court concludes that the motion is due to be granted as to plaintiff's Title VII claims. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims and will dismiss them without prejudice.

## BACKGROUND[1]

Plaintiff began working at defendant's restaurant in Ozark. Alabama as a server on September 7, 1995. (Barker Affidavit, ¶¶ 3, 12). One day shortly thereafter, Gibson looked at plaintiff and said, "Man, you're something." (Plaintiff's deposition, pp. 52–53). There were times when Gibson would crowd plaintiff, making physical contact with her back, as she worked making tea or putting food into containers. (*Id.*, pp. 53–54). Gibson made comments to plaintiff about her husband being with and wanting other women. Gibson pointed out women in the restaurant and told plaintiff that they wanted him. (*Id.*, pp. 55–56). On one occasion, Gibson summoned plaintiff and told her, "I'm going to tell your husband that you want me." (*Id.*, p. 57). A few times, Gibson told plaintiff that he wanted to talk to her. When she reported to his office, he told her that he did not want to see her. (*Id.*, pp. 58–59). Gibson telephoned plaintiff at home for no apparent reason, saying things like, "The sun is shining," or "It's Friday." Once, he called and asked to speak to plaintiff's husband. When plaintiff recognized his voice and asked why he was calling, he said, "You're not supposed to recognize my voice." Gibson hung up without speaking to plaintiff's husband or stating why he was calling. (*Id.*, p. 60). Gibson called plaintiff at home four or five times while she was employed at Golden Corral and four or five times after her employment was terminated. (*Id.*, pp. 62–63).

Gibson often told plaintiff that he was going to tell plaintiff's husband that she had gone to the home of Sean, a cook at the restaurant, and that she "wanted" Sean. Gibson frequently told plaintiff that Sean had called and that he "wanted" plaintiff. (*Id.*, p. 73). Gibson threatened to call plaintiff's husband and tell him, untruthfully, that she had been smoking.

(*Id.*, p. 74). On one occasion, plaintiff asked Gibson about whether the restaurant had a certain size dinner roll. Gibson responded by saying, "[W]e have them this long, and we have them this long," while gesturing to his crotch and walking "kind of silly." (*Id.*, pp. 75, 190–91).

Gibson frequently grabbed plaintiff by the arm. (*Id.*, p. 77). Sometimes, he pulled her to a table to show her something, such as a ketchup bottle, that she had missed and that she needed to take care of. Once, he grabbed both of plaintiff's arms and pulled her across the floor, ignoring her pleas that he stop. On another occasion, Gibson grabbed plaintiff by the arm and pulled her down behind the serving counter to question her about whether she had given two customers salad plates. Again, Gibson ignored plaintiff's requests that he release her. When plaintiff tried to get up, he pulled her back down again. (*Id.*, pp. 76–91).

One night, while plaintiff and Gibson were alone after the restaurant had closed, Gibson went outside and locked plaintiff in. She went to the door and told him that she was scared and to let her out. Gibson laughed at her and refused to let her out until plaintiff's husband approached in a car. (*Id.*, pp. 78–80).

Gibson once threw a salad dressing container and spatula at plaintiff because she had failed to scrape the container out before discarding it. (*Id.*, p. 103). Later, Gibson told plaintiff, "You're ugly." When plaintiff didn't respond, he told her. "Sean called and he wants you and he wants you to go give him a bath." Plaintiff told Gibson that his conduct upset her and asked him to stop. Gibson then repeated several times that plaintiff was old and ugly. A few times that evening, Gibson repeated his comments about Sean want-

---

1. As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992). The parties have stated no objection to any of the evidence. The court accordingly considers any objection to the admissibility of the evidence waived for purposes of this motion. *Davis v. Howard,* 561 F.2d 565, 570 (5th Cir. 1977).

ing plaintiff to give him a bath, and told plaintiff that he was going to call her husband and tell him that she had gone to Sean's house. (*Id.*, pp. 103–05). Gibson threw silverware in the garbage, then accused plaintiff of throwing it away. Gibson directed plaintiff to retrieve the silverware. (*Id.*, pp. 130–33). On one occasion, plaintiff was working the line and Gibson was cooking, so that they had to work "hand in hand." Plaintiff lost control of her bladder, allegedly because of "stress." (*Id.*, pp. 183–87).

On May 10, 1996, when Gibson thought plaintiff had broken a plate, he grabbed her left arm and jerked it repeatedly. (*Id.*, pp. 147–49). Shortly after the incident, plaintiff called defendant's District Manager, Mike Barnes. (Barnes affidavit, ¶ 7; Plaintiff's Exhibit B). Plaintiff disputed Gibson's explanation to Barnes that he had grabbed plaintiff to keep her from falling. She told Barnes that Gibson had grabbed her in anger because he thought she had broken the dish, that her husband had since told him not to touch her again, that Gibson had grabbed her on previous occasions, that she was uncomfortable working with Gibson, that he was treating her differently and not speaking to her since the incident, that he was shunning her, and that she was nervous because she believed Gibson was angry at her for telling on him. (Plaintiff's Exhibit B). Barnes told plaintiff that the best thing for her to do, if she wanted to continue working at the restaurant, was to have a meeting with Gibson to discuss the situation. He stated. "The best thing for you to do at this point [sic] would be to, if you feel comfortable doing it, would be to do that. You know, I will talk to Mr. Gibson in a general sense about how he should be handling and treating situations. Because obviously, if he grabbed a coworker, that is not a situation that we want to happen in the restaurant, in any restaurant we have and it should not be happening. So he will get strongly reprimanded for that situation for handling it that way." (Plaintiff's Exhibit B, p. 14). Barnes told plaintiff to let

him know if he needed to get involved further. (*Id.*).

Plaintiff obtained medical treatment and workers compensation benefits for the injury Gibson caused to her arm. (Plaintiff's deposition, p. 28; Plaintiff's Exhibit B, p. 10: Barnes affidavit, ¶ 7). While she was away from work on a period of temporary disability, plaintiff asked Gibson to meet with her. Plaintiff talked with Gibson in the presence of two employees, Diedre and Theresa, and Gibson said that he did not realize that his grabbing plaintiff bothered her and that he would not grab her anymore. (Plaintiff's deposition, pp. 45–46). After her meeting with Gibson, plaintiff returned to work for a few days on light duty. (Plaintiff's deposition, pp. 46–47, 122; Barker affidavit, ¶ 10). Thereafter, plaintiff approached Gibson and asked him if they could talk. She told him, "We can't work this way. Now you're shunning me, you're not talking to me, you don't speak to me, you give me ugly looks. We can't— I can't—we've got to do something." (Plaintiff's deposition, p. 48). During this conversation, Gibson denied grabbing plaintiff. (*Id.*). In light of his denial, plaintiff told Gibson that they could not resolve the situation. She asked him to arrange for the two of them to meet with Barnes and to ask Barnes to call her. She told him that she would not be back to work until she heard from Barnes. Plaintiff was not contacted by Barnes and she did not call him. (*Id.*, pp. 169–71). Plaintiff did not return to work after June 5, 1996. (Barker affidavit, ¶ 12).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993). In

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue ... Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial ... We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.... Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves...."

*Id.* at 324, 106 S.Ct. 2548.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Electrical Industrial Company v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### *Quid Pro Quo* Sexual Harassment Claim

Count One of the complaint is styled *Quid Pro Quo.* (Complaint, ¶¶ 22–29). In her response to the present motion for summary judgment, plaintiff concedes that this claim is "ultimately due to fail." (Plaintiff's Brief, p. 8). The court will construe this statement as a motion to amend the complaint to delete this claim, and will grant the motion.

### Hostile Work Environment

Golden Corral argues that it is entitled to summary judgment on plaintiff's hostile environment claim because the conduct alleged by plaintiff does not "demonstrate a work environment which a reasonable person would regard as 'permeated with discriminatory intimidation, ridicule, and insult.'" (Defendant's Brief, p. 24). Golden Corral further argues that, even if the facts alleged by plaintiff establish a hostile environment, it cannot be held liable because plaintiff failed to complain of the harassment. (*Id.,* p. 24–26).

#### *"Severe or Pervasive"*

The elements of a Title VII sexual harassment claim are the following: (1) the employee must belong to a protected group; (2) the employee must have been subject to unwelcome sexual harassment; (3) the harassment must have been based on sex; (4) the harassment must have been sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment either directly or

indirectly. *See Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir. 1982). Whether an employee can satisfy his or her burden of showing that the work environment is hostile or abusive is a fact-specific question, requiring analysis of all the circumstances. *Mendoza v. Borden, Inc.,* 158 F.3d 1171, 1175 (11th Cir.1998). In *Mendoza,* plaintiff testified that her supervisor, the highest ranking executive at the facility, constantly followed her around the plant, "staring at her and looking her up and down in a sexually suggestive manner." *Id.* She further testified that on two occasions, he stared at her groin area and made a sniffing sound, that he had once rubbed his hip against hers while touching her shoulder, and that he made inappropriate comments, once telling her "I'm getting fired up" when she came into his office. *Id.* In *Mendoza,* the Eleventh Circuit reiterated that it is improper to judge each incident alleged in a hostile environment claim in a vacuum. Instead, the court noted, all of the alleged harasser's actions "must be viewed together to assess whether a jury could conclude that his conduct created a hostile work environment." *Id.* at 1176. The court reversed the district court, which had granted the defendant's motion for a directed verdict, stating that the totality of the plaintiff's testimony was sufficient to survive the motion. The court did so despite its observation that a jury might well conclude that the plaintiff had not been subjected to sexual harassment that was sufficiently severe or pervasive to create a hostile work environment. *Id.* at 1176–77.

 In determining whether an environment is actionably hostile, the court considers all the circumstances, including the frequency of the discriminatory conduct, the gravity of the incidents, whether the offensive conduct is physically intimidating or humiliating or a mere offensive utterance, and whether it unreasonably interferes with plaintiff's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The court concludes that the evidence of record is sufficient—albeit marginally so—to present a jury question regarding whether Gibson's conduct was sufficiently severe and abusive to create an actionable hostile environment. Plaintiff testified that there were times that Gibson would crowd her, touching her back, while she was working. Golden Corral suggests that this contact was accidental, caused by a confined work area. (Defendants' Brief, p. 23). Regarding plaintiff's allegations that Gibson physically assaulted her by grabbing her wrist or arm on a number of occasions, Golden Corral argues that "there is no sexual connotation whatever ..." and that Gibson behaved similarly to two male employees. (*Id.*). "Physical contact ... can occur in many different contexts in the workplace. It may be accidental, innocent, or actionable, depending on how it occurred or whether and what kind of other acts the plaintiff alleges as well as the social context of the particular workplace." *Mendoza,* 158 F.3d at 1176. In the present case, the alleged conduct was physically threatening and ultimately resulted in injury. The other acts alleged by plaintiff include Gibson's oblique reference to the size of his penis, as well as a significant number of comments regarding women "wanting" Gibson, plaintiff "wanting" Sean, Sean "wanting" plaintiff, and plaintiff "wanting" Gibson, and Sean wanting plaintiff to bathe him. The acts alleged by plaintiff occurred over a relatively brief period of about eight months.

On these facts, the court cannot conclude—as a matter of law—that no reasonable trier of fact could find that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ..." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

### *Ellerth/Faragher Defense*

 Defendant argues that, even if plaintiff's evidence is sufficient to establish

the elements of a hostile work environment claim, it is nevertheless entitled to summary judgment on the basis of the affirmative defense established by the Supreme Court in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In *Faragher* and another case decided the same day, *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Court announced a rule regarding the imposition of employer liability for harassment by a supervisor:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preven-

tive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth,* 118 S.Ct. at 2270.

■ Plaintiff does not dispute that the defense is available to defendant.[2] Instead, she argues that defendant cannot establish the elements of the affirmative defense. (Plaintiff's Brief, pp. 12–14). In determining whether an employer can establish the defense, the court must first determine "whether the employer has exercised reasonable care in preventing sexual harassing behavior." *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1369 (11th Cir.1999). "The court next directs its inquiry to whether the employee made reasonably sufficient use of available avenues to put the employer on notice of the problem. Finally, the court refocuses on the employer to determine whether the employer or its authorized agent, after receiving notice of the harassment, took adequate steps to abate it and prevent its recurrence." *Id.*

---

**2.** There is some authority suggesting that the *Ellerth/Faragher* defense is unavailable where the plaintiff establishes a constructive discharge. *See Phillips v. Taco Bell Corp.,* 156 F.3d 884, 889 n. 6 (8th Cir.1998) (affirmative defense available where plaintiff did not establish constructive discharge); *Maddin v. GTE of Florida, Inc.,* 1999 WL 38604, *6 (M.D.Fla. Jan.27, 1999) ("While a constructive discharge can constitute a tangible employment action, *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 n. 2 (11th Cir.1997), that does not preclude GTE from asserting this defense, because, as discussed below, Maddin was not constructively discharged."); *Jones v. USA Petroleum Corp.,* 20 F.Supp.2d 1379, 1383 (S.D.Ga.1998) ("Under *Ellerth* and *Faragher,* then, each plaintiff's Title VII case against USAP turns initially on whether they suffered a tangible adverse employment action (e.g., constructive discharge). If either plaintiff did, then USAP can be found vicariously liable for Brown's actions under hostile working environment and/or constructive discharge theories. If they did not, then USAP can invoke the *Ellerth/Faragher* affir-

mative defense."). *But see Mendoza, supra,* 158 F.3d at 1177 (Eleventh Circuit did not address issue directly but noted, in case involving an allegation of constructive discharge, that "on remand, [defendant] will have the opportunity to establish whether the affirmative defense outlined in *Faragher* would apply"). The *Ellerth* case itself involved an allegation that the plaintiff had quit her job because of her supervisor's harassment. 118 S.Ct. at 2262. The Supreme Court found the affirmative defense to be available to the employer, noting that "Ellerth has not alleged she suffered a tangible employment action at the hands of Slovik." 118 S.Ct. at 2271. In view of this fact, and upon a careful review of the Court's discussion of "tangible employment action," and its rationale for holding the affirmative defense to be inapplicable in cases involving such an action, 118 S.Ct. at 2268–69, the court concludes that the allegations and evidence before the court do not allege or establish a tangible employment action which would preclude defendant's assertion of the affirmative defense.

*Step One: Reasonable Care to
Prevent Harassment*

■ Defendant has introduced evidence that it has a policy prohibiting sexual harassment, which is set forth in a Co–Worker Orientation Handbook. (Exhibit C to Barker affidavit). Gloria Barker, defendant's Labor and Employment Law Administrator, states that the Co–Worker Orientation Handbook is provided to all Golden Corral employees when they are hired. (Barker affidavit, ¶ 6). Barker has provided the court a copy of a document entitled Co–Worker Drug–Free Workplace Policy which bears plaintiff's signature. (Exhibit D to Barker affidavit). According to Barker, the reverse of this document is an acknowledgment of receipt of the Co–Worker Orientation Handbook. She avers that the single sheet on which the Drug–Free Workplace Policy and the acknowledgment are printed is perforated so that it can be removed from the handbook and placed in the employee's personnel file, while the employee retains the original handbook. (Barker affidavit, ¶ 6).

Plaintiff concedes that Golden Corral "did and does have a published sexual harassment policy and procedure," but argues—without citation to evidence of record—that the procedure was not properly communicated to plaintiff. (Plaintiff's Brief, p. 13). In Exhibit C to Barker's affidavit, the Co–Worker Orientation Handbook, the acknowledgment statement and Drug–Free Workplace Policy appear on pages 21 and 22, respectively. In contrast, the Drug–Free Workplace Policy signed by plaintiff bears a page number of 36. It is apparent, therefore, that the policy signed by plaintiff appeared in a handbook that is not identical to Exhibit C and that is not before the court. Accordingly, the court cannot infer that plaintiff received a copy of the written sexual harassment policy as set forth in Exhibit C. That fact is not dispositive of the issue before the court, however.

Plaintiff argues only that the complaint procedure was not properly communicated to her. Barker states that a poster outlining its open door policy was posted in an "employee frequented area." (Barker affidavit, ¶ 7). The poster has a prominent heading of "Open Door Policy." It states:

Golden Corral Corporation is committed to provide the best possible working conditions for our employees. This means encouraging an open and frank environment in which any problem, complaint, suggestion, or question is answered quickly and accurately. Be assured that any concern brought forward in good faith will not result in discrimination or retaliation. We welcome the opportunity to help resolve issues that will keep our environment safe, healthy, and productive. When problems arise, the following procedure is recommended for handling and resolving issues:

Step One: Discuss the problem in a frank and honest way with your supervisor or manager. This is usually the most effective and easiest way to deal with job-related concerns. If the concern is with your direct supervisor, or is of a delicate nature, you have the right, and obligation, to start at the second step.

Step Two: Talk with the next level of management. If you choose to skip the first step or do not receive a satisfactory response at the first step, discuss the matter with the department head or other member of management within your department.

Step Three: Pursue the matter with Human Resources on a confidential basis. If, at any time, you do not feel you have been given a fair and reasonable answer, or you are uncomfortable in using the other steps in the process, Human Resources will work with you to determine the most appropriate way to address the issue.

Step Four: Request a discussion with senior management. If you do not

feel the issue has been properly resolved using any of the other recommended steps, you may request a discussion with any member of upper level management, up to and including the President and CEO.

When a person to person communication is not feasible or the issue has not been resolved, employees may call the Golden Corral Employee Hotline at 1–800–94–GOLD'N (1–800–944–6536). This toll free number is available to all employees 24 hours a day, seven days a week. An outside agency with trained operators will document your call and forward the information to the appropriate person within Golden Corral for resolution or consideration. All calls are treated with the strictest confidence. You do not have to give your name. If you do not give your name, your information will be forwarded to the Human Resources department in the Home Office, and of course, your call can not be investigated. The hotline is available for concerns, complaints, suggestions, or requests for information.

(Exhibit E to Barker affidavit). Gibson testified that the Open Door Policy is on a legal-size paper which is laminated and posted on the bulletin board "in the back," in front of the area where employees wash their hands, that the policy was posted the entire time Gibson worked there, and that there were no other documents covering it up or overlapping it. (Gibson deposition, pp. 47–48, 52–57). Plaintiff has directed the court to no evidence that the policy was not posted as described by Barker and

Gibson.[3] Therefore, it is undisputed that the policy was prominently displayed in a location where plaintiff could be expected to see it. It is further undisputed that defendant's policy provides alternate avenues for complaint, including a toll-free hotline.

As noted above, plaintiff concedes that "Golden Corral did and does have a published sexual harassment policy ..." (Plaintiff's Brief, p. 13). Gibson was apparently aware of the policy. (Gibson deposition, pp. 44–47). By posting its open-door complaint policy prominently in plaintiff's work area, Golden Corral exercised reasonable care to ensure that employees were aware of complaint procedures. Golden Corral need not establish that every employee read the posted policy to establish that it exercised reasonable efforts to communicate the procedure. The court concludes that plaintiff has not demonstrated the existence of a genuine issue of material fact regarding whether Golden Corral exercised reasonable care in preventing sexually harassing behavior.

### Step Two: Plaintiff's Use of Available Avenues

To satisfy the second element of the affirmative defense, an employer must prove that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* Golden Corral argues that plaintiff made no complaint of sexual harassment during her employment. Plaintiff argues that, during her telephone call to Barnes, she complained of hostile environment harassment. (Plaintiff's Brief, p. 13).[4] The content of that tele-

---

**3.** Plaintiff was previously advised that "if a document, including a deposition, is to be considered on summary judgment, the party offering the exhibit must specifically designate in its brief which pages of the exhibits support its position." (Order entered November 5, 1998). Plaintiff argues that she has testified that the complaint procedure was not properly communicated to her. (Plaintiff's Brief, p. 13). Nowhere in her brief does she cite the location of this testimony. The court declines to search for it.

**4.** In its brief, Golden Corral refers to plaintiff's complaints to an employee named Theresa Capp in connection with its affirmative defense. (Defendants' Brief, p. 12). Plaintiff's testimony as to such complaint is vague. Plaintiff testified, "[I] asked [Capp] what I could do about this. I told her I just didn't know what to do about this and that I was really at my end. And I told her, I said, The only thing that I can think that I can do is to call Mr. Barnes." (Plaintiff's deposition, pp. 142–43). Plaintiff does not argue in her brief

phone conversation is undisputed and is set forth in a transcript. (Plaintiff's Exhibit B: Defendants' Exhibit 5). The court concludes that, even drawing all reasonable inferences from the evidence in favor of plaintiff, her complaint to Barnes was not adequate to put Golden Corral on notice of the alleged sexual harassment.

Plaintiff's conversation with Barnes was, as defendant argues, directed primarily to advising Barnes that Gibson had grabbed plaintiff's arm in anger during the May 10th incident. Plaintiff did advise Barnes that this was not the first time Gibson had grabbed her, that "it always bothers [her] when he grabs hold of [her]" and that her husband had told Gibson not to touch her anymore. (Transcript, pp. 8–9). When Barnes told plaintiff that he had been told that Gibson had grabbed plaintiff to keep her from falling, plaintiff responded. "And that is my whole reason for wanting to call you because I just, I wanted you to know the truth. When I found out that he had told you he just grabbed me because he was trying to keep me from falling, that is what he told my husband also, and that is not true. He was just angry because he thought I broke a plate." (*Id.*, p. 12). Plaintiff complained that Gibson was treating her differently since the incident, that she did not want to be alone with him because she was sure he was angry because she had told on him. As the conversation concluded, plaintiff stated. "You know even to coworkers, you know I have bumped into people before. They have bumped into me, Teresa and I bumped into each other a couple of days ago. I mean people bump into each other. But he is my boss, he is the man I work for. And to actually purposely grab me, I don't, and then the thing that, then to tell you [and] Teresa and whoever that it was because he was concerned that I was falling and that is just an untruth and that is what made me unhappy." (*Id.*, p. 14).

that this is evidence of a complaint of sexual harassment, or otherwise refer to her conversation with Capp. The court concludes that, even drawing all reasonable inferences in fa-

Gibson's actions in jerking plaintiff's arm may have been part of a pattern of sexual harassment. However, Barnes could have concluded that this was so, however, only if he were apprised of Gibson's other conduct—*e.g.*, his practice of rubbing against plaintiff's back and repeatedly making inappropriate sexual comments. There was nothing in plaintiff's conversation with Barnes to alert him to these other, sexually harassing, aspects of Gibson's conduct. Having chosen to relate only a discrete portion of the problem to Barnes—and having specifically attributed Gibson's conduct to anger about a broken plate—plaintiff cannot now complain about Barnes' failure to surmise that Gibson's conduct amounted to sexual harassment. If plaintiff intended to complain to Barnes about sexual harassment, she had an obligation to tell him so or, at least, to give him sufficient facts from which he could conclude that plaintiff's problem involved conduct directed at her because of her sex. *See Fierro v. Saks Fifth Avenue*, 13 F.Supp.2d 481, 492 (S.D.N.Y.1998) ("At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment."). The court concludes that plaintiff's complaint to Barnes was simply not sufficient to put Barnes on notice of sexual harassment, and that no reasonable trier of fact could conclude that it was.

*Step Three: Adequacy of Response*

Plaintiff points to evidence that Gibson was never counseled or reprimanded regarding the incident and argues that Golden Corral's response to her complaint was inadequate. However, since the court has concluded that plaintiff's telephone conversation was insufficient to put Golden Corral on notice of sexual harassment, the court need not address the adequacy of the response. *Coates*, 164 F.3d at 1370 ("Only if it is determined that adequate notice of

vor of plaintiff, this evidence is insufficient to create an issue of fact regarding whether plaintiff complained to Capp of sexual harassment.

the harassment was given to [the employer] would it be necessary to determine whether [the employer] responded reasonably to [plaintiff's] complaint.").

The court concludes that Golden Corral is entitled to summary judgment as to plaintiff's hostile environment claim on the basis of its *Ellerth/Faragher* affirmative defense. Additionally, to the extent that plaintiff's complaint sets forth a separate claim for constructive discharge because of the hostile environment. Golden Corral is entitled to summary judgment on that claim for the same reason.[5]

### Retaliation

Golden Corral argues that it is entitled to summary judgment on plaintiff's Title VII retaliation claim because plaintiff cannot establish a *prima facie* case of retaliation. Plaintiff does not respond to defendant's arguments regarding her retaliation claim. In her complaint, plaintiff alleges that "Defendants retaliated against Plaintiff for opposing illegal sexual harassment. The retaliation took the form of physical and verbal abuse, denial of privileges previously freely given, and was so unrelenting that it ultimately resulted in Plaintiff's constructive discharge." (Complaint, ¶ 42).

■ To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir.1998).

#### Statutorily Protected Expression

■ Opposition to illegal discrimination is statutorily protected expression. 42 U.S.C. § 2000e–3(a). Plaintiff alleges that she opposed unlawful sexual harassment.

However, plaintiff does not claim to have reported the alleged sexual harassment to any of Gibson's superiors other than Barnes. (Plaintiff's deposition, pp. 164–65). The transcript of plaintiff's conversation with Barnes reveals that plaintiff did not oppose, discuss or suggest unlawful sex discrimination during that conversation. (Plaintiff's Exhibit B). Plaintiff has directed the court to no evidence that she opposed illegal sexual harassment in any manner other than speaking with Barnes about Gibson's arm-grabbing.

If a reasonable person in Barnes' position would have understood that plaintiff was complaining about sexual harassment, the conversation would constitute protected opposition. *See Burns v. Republic Savings Bank,* 25 F.Supp.2d 809 (N.D.Ohio 1998) (finding protected opposition where a reasonable person would have understood that plaintiff was threatening a discrimination lawsuit).

It is well-established that an employee's express complaints to supervisors about perceived discriminatory practices constitutes protected activity.... At the other end of the spectrum, however, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance.... Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. The relevant

---

5. Additionally, as discussed above, plaintiff failed to give Golden Corral adequate notice of the sexual harassment. Thus, her constructive discharge claim based on this harassment would fail. *See Jones, supra,* 20 F.Supp.2d at 1383 (" '[C]onstructive dis-

charge will generally not be found if the employer is not given sufficient time to remedy the situation.' ... Obviously an employer cannot be given sufficient time to remedy, for example, a hostile environment, if it is not provided notice of it.") (citations omitted).

question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

*Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 559–60 (D.Kan.1995) (citations and parentheticals omitted). In her conversation with Barnes, plaintiff clearly expressed that Gibson had grabbed her arm on a number of occasions. As discussed above, however, there is nothing in the conversation to indicate that the arm-grabbing occurred because of plaintiff's sex, or that it was part of a larger pattern of sexual harassment. Plaintiff's complaint to Barnes was simply not adequate to put him on notice that she was complaining of sexual harassment. Thus, the court concludes that plaintiff has not established the first element of the *prima facie* case, *i.e.,* that she engaged in statutorily protected expression. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir.1989) (employee's allegation in letter that charges against him were a result of "ethnocism" and that supervisor may be a racist is a "vague charge of discrimination" insufficient to constitute "opposition" under state statute patterned after Title VII); *Aldridge v. Tougaloo College,* 847 F.Supp. 480, 484–85 (S.D.Miss.1994) ("Nowhere in the above grievance does plaintiff protest any form of sex discrimination. Her grievance does not even mention that a male was hired for this position. Instead, her grievance complains that the job vacancy was not properly noticed and that Mrs. Lee had treated her unfairly in certain respects. Plaintiff, then, has not met the first element—statutorily protected expression—of her prima facie case. Her grievance had nothing to do with alleged sex discrimination by Tougaloo College."); *see also Primes v. Reno,* 999 F.Supp. 1007, 1016 (N.D.Ohio 1998) ("[P]laintiff here offered vague suggestions of racism as one possible explanation of what he perceived as a poor evaluation, but this is not sufficient to constitute 'op-

position' under Title VII and cannot form the basis for a retaliation claim.").

### Adverse Employment Action

Even if plaintiff's complaint to Barnes were sufficient to constitute protected opposition to unlawful sex discrimination, she has not demonstrated that she suffered an adverse employment action as a consequence of that complaint. "To show that she suffered an 'adverse job action,' [plaintiff] must demonstrate that the job action affected 'a term or condition of employment and the job action is not adverse merely because the employee dislikes it or disagrees with it.'" *Malladi v. Brown,* 987 F.Supp. 893, 915 (M.D.Ala.1997) (citation omitted). The action need not rise to the level of an "ultimate employment action" such as discharge, but must meet "some threshold level of substantiality." *Wideman, supra,* 141 F.3d at 1456.

Plaintiff's conversation with Barnes occurred while she was out of work on a period of temporary disability as a result of the May 10, 1996 incident. (Barnes affidavit, ¶ 7). Thereafter, plaintiff returned to work for a brief period of two to four days on light duty. (Plaintiff's deposition, pp. 46–47; Barker affidavit, ¶ 10). As noted above, plaintiff has not responded to Golden Corral's arguments on her retaliation claim, and she has not directed the court to evidence of the specific acts that she claims were retaliatory. The record reveals only one contact between plaintiff and Gibson during plaintiff's period of temporary disability—the meeting attended by Diedre and Theresa in which Gibson stated that he did not realize his grabbing bothered plaintiff and that he would not grab her anymore. (Plaintiff's deposition, p. 45). Plaintiff testified that she spoke to Gibson during her brief return to work and complained about his shunning her, not speaking to her, and giving her "dirty looks". During this conversation, Gibson denied grabbing plaintiff. (Plaintiff's deposition, pp. 48–49). Plaintiff then told Gibson to arrange a meeting with Barnes, and that she would not come back

to work until she heard from Barnes. (Plaintiff's deposition, pp. 169–71). In its review of the record, the court has located no other evidence of particular actions taken against plaintiff during the relevant time period after plaintiff spoke with Barnes. The court concludes that Gibson's actions in denying that he had grabbed plaintiff, shunning her, not speaking to her, and giving her "dirty looks," and Barnes' failure to contact plaintiff after her announcement that she would not return to work unless he did so—considered in the aggregate—do not constitute an adverse employment action sufficient to support a Title VII retaliation claim. *See EEOC v. Union Camp Corporation,* 7 F.Supp.2d 1362, 1380 (S.D.Ga.1997) (no adverse action where plaintiff was "ostracized," her performance and break time were monitored more closely, she was interrogated about complaint regarding swimsuit calendars and scolded for taking too long a break).

To the extent that plaintiff claims that Gibson's post-complaint actions toward her are sufficient to support a retaliation claim premised on constructive discharge, the court disagrees. Constructive discharge may form the basis of a Title VII retaliation claim. *See Portera v. Winn Dixie of Montgomery, Inc.,* 996 F.Supp. 1418, 1433 (M.D.Ala.1998); *see also Meeks v. Computer Associates International,* 15 F.3d 1013 (11th Cir.1994). However, to sustain a claim of constructive discharge, a plaintiff " 'must demonstrate that her working conditions were so intolerable that a reasonable person in her position would have been compelled to resign.' " *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993) (quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989)). Viewed in the light most favorable to plaintiff, the facts are insufficient to demonstrate intolerable working conditions after plaintiff's complaint to Barnes. *See Portera, supra,* 996 F.Supp. at 1434 ("The only evidence before the court as to the working conditions of the Plaintiff is her statement, without explanation, that [the store manager] isolated her, and her evidence

that she was ignored by some employees, and that she considered the work atmosphere to be cold. The court cannot conclude that this evidence is sufficient to establish that a reasonable person would have felt compelled to resign."). Since plaintiff's post-complaint working conditions are not sufficient to support her allegation of constructive discharge, plaintiff has not established the adverse employment action required to support her retaliation claim.

Plaintiff has not demonstrated that she engaged in protected opposition to sexual harassment or that she suffered an adverse employment action. Thus, Golden Corral is entitled to summary judgment on plaintiff's retaliation claim.

### State Law Claims

Plaintiff has no remaining federal claims. The court declines to retain supplemental jurisdiction over the state law claims and will dismiss them without prejudice. *See* 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction); *Mergens v.Dreyfoos,* 166 F.3d 1114, 1999 WL 46751, *5 (11th Cir.1999) (dismissal of state law claims pursuant to § 1367(c) encouraged if federal claims dismissed prior to trial).

### CONCLUSION

For the foregoing reasons, it is

ORDERED that plaintiff's statement in her brief that she cannot establish her *quid pro quo* claim is construed as a motion to amend the complaint to delete that claim and is hereby GRANTED.

It is further ORDERED that defendants' motion for summary judgment is GRANTED as to plaintiff's Title VII claims, and that plaintiff's state law claims of assault and battery, invasion of privacy and intentional infliction of emotional harm are DISMISSED without prejudice.

Additionally, the court notes that its order of December 17, 1997 dismissing plain-

tiff's Title VII claims against the individual defendant, Ricky Gibson, was entered after the parties had indicated their consent to Magistrate Judge jurisdiction by not requesting reassignment within the period allowed by the court, but before the parties had filed their written consent. To avoid any potential issue regarding this court's authority to dismiss the claims, it is hereby ORDERED that the court reaffirms and adopts its December 17, 1997 order, and plaintiff's Title VII claims against defendant Gibson are DISMISSED for the reasons stated in that order.